IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:23-cr-00077-MR-WCM-1

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> v. ) <br> ) <br> PAUL ANTHONY VALDEZ, JR., ) <br> ) <br> Defendant. ) <br> _____ ) | MEMORANDUM AND RECOMMENDATION |

This matter is before the Court on Defendant's Motion to Suppress (Doc. 18), which has been referred to the undersigned pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

I. Relevant Procedural Background

On October 3, 2023, a Bill of Indictment was filed charging Paul Anthony Valdez, Jr. ("Defendant") with one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Doc. 1.

On October 13, 2023, Defendant made an initial appearance. He requested that counsel be appointed for him, and that request was granted. Also, Defendant was arraigned and entered a plea of not guilty.

On February 12, 2024, Defendant filed the Motion to Suppress, by which he moves to suppress evidence seized during a warrantless search of a white Nissan sport utility vehicle (the "SUV") in which he was a passenger.

1

The Government responded to the Motion to Suppress, Doc. 22, and a hearing was conducted on May 1, 2024. The parties also submitted supplemental briefing. Docs. 28, 29.

This Memorandum now follows.

## II. Factual Background

"When material facts that affect the resolution of a motion to suppress… are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir. 1994). In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. Gualtero, 62 F. Supp. 3d 479, 482 (E.D. Va. 2014) (citing United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993)).

### A. The Evidence Presented

At the hearing, the Government called Detective Steven Escobedo[1] and Detective Brad Beddow, both of the Asheville Police Department ("APD"). The Government also introduced two images from body worn camera footage of the subject traffic stop (the "Traffic Stop") and the entirety of the footage from

---

[1] At the time of the events in question, Detective Escobedo was an officer and therefore is referred to in this Memorandum by his rank at that time.

Officer Escobedo's and Detective Beddow's body worn cameras from the Traffic Stop.

Defendant did not call any witnesses but submitted reports of the Traffic Stop by Detective Beddow and Officer Escobedo (Docs. 18-2 & 18-3), a map showing the location of the Traffic Stop (Doc. 18-4), copies of indictments issued by a state court in Virginia (Doc. 18-5), documents related to Defendant's arrest on March 29, 2023 (Doc. 18-6), documents related to Defendant's arrest on June 22, 2023 (Docs. 18-7 & 18-8), a flow chart from the Commonwealth of Virginia's Extradition Manual (Doc. 18-9), an affidavit by Defendant (Doc. 18-10),[2] and footage from the body worn cameras of APD Sergeant Evan Flanders and APD Detective Patrick DeStefano.

### B. Factual Findings

Based on the information of record and as presented during the hearing, the undersigned finds the relevant facts to be as follows:

---

[2] During the hearing, the undersigned overruled the Government's objections to the admission of Defendant's affidavit. See e.g., U.S. v. Sanchez, 535 F.Supp.2d 216, 224 n.8 (D. Mass. 2008) (denying government's motion to strike the defendant's affidavit, and explaining that "the government's objection goes to the weight to be given to the affidavit" but recognizing the court's discretionary ability to strike the affidavit because of the defendant's refusal to testify at the suppression hearing), affm'd, 612 F.3d 1 (1st Cir. 2010), cert. denied, 131 S.Ct. 621 (2010).

### 1. Events Prior to June 22, 2023

On February 21, 2023, Defendant was indicted in Virginia state court on two counts of distribution of controlled substances while at a correctional facility (the "Virginia Charges"). Doc. 18-5.

On March 29, 2023, Defendant was arrested by Officer Joshua Myrick of the Woodfin Police Department in Buncombe County, North Carolina on the Virginia Charges. Thereafter, Defendant was released on a secured bond. Doc. 18-6.

### 2. June 22, 2023

On June 22, 2023, APD officers were surveilling three rooms at the Econo Lodge Hotel on Tunnel Road in Asheville, North Carolina when they observed a dark Nissan Altima come and go several times.

Some officers conducted a traffic stop of the Altima, while others remained at the Econo Lodge and continued undercover surveillance. The Altima, its passengers, and the passengers' belongings were searched, and three firearms were seized, including one that had been stolen. One of the passengers was the minor son of Kiauna Meadows ("Meadows").

Meadows went to the scene of the traffic stop of the Altima to pick up her son; she drove the SUV and Defendant, who was Meadows' boyfriend, rode in the passenger seat. Before allowing Meadows' son to leave with Meadows and Defendant, officers ran their names through a local Records Management

4

System ("RMS"). Neither Meadows nor Defendant were flagged in that database.[3]

Subsequently, undercover officers reported that Defendant and Meadows had arrived at the Econo Lodge in the SUV. They also reported that Defendant exited the SUV while wearing a black fanny pack around his neck, entered one of the three rooms under surveillance for a brief period, and returned to the SUV while still wearing the fanny pack.[4]

The SUV then left the Econo Lodge and Officer Escobedo ran Defendant's driver's license information (which Officer Escobedo had obtained from the RMS database) through the National Crime Information Center ("NCIC") database. The NCIC database showed that there was an active warrant for Defendant's arrest from Virginia. The NCIC database included a photo – which Officer Escobedo testified appeared to be Defendant – and Defendant's date of birth. Additionally, the NCIC database indicated that the sheriff's office in

---

[3] In his supplemental briefing, Defendant asserts generally that the RMS system shows if an officer arrests someone in Buncombe County on an out-of-state fugitive warrant. Doc. 28 at 3, n. 1. However, no evidence was presented to indicate that Defendant's March 29, 2023 arrest appeared in the RMS system on June 22, 2023.

[4] In his affidavit, Defendant states that after he and Meadows picked up Meadows' son (after the traffic stop of the Altima), they drove to a laundromat and then to the Econo Lodge to meet the boy's father. Defendant states that Meadows' son asked Defendant to hold his fanny pack "for safekeeping" and that Meadows' son stayed behind at the Econo Lodge. During the hearing, no testimony was presented regarding the whereabouts of Meadows' son following the traffic stop of the Altima.

Chatham, Virginia was the agency that had entered the warrant information and that Defendant was wanted on a narcotics related offense.

Officer Escobedo relayed this information to Sergeant Flanders, who advised officers by radio that they would stop the SUV and arrest Defendant.

Detective Beddow, who was driving a separate patrol vehicle in which Sergeant Flanders was riding, initiated the Traffic Stop and the SUV stopped on the shoulder of an on-ramp to Interstate 240. Detective Beddow parked immediately behind the SUV and, less than a minute later, Officer Escobedo parked his patrol vehicle on the driver's side of the SUV. Other officers – "most everybody" that was working at the Econo Lodge location – eventually arrived at the scene.

Officer Escobedo approached the driver's side of the SUV and spoke with Meadows, who was in the driver's seat. He asked her if there was anyone in the backseat, and she stated that her minor daughter was there.[5] Officer Escobedo asked Meadows to exit the SUV and Detective DeStefano opened the rear driver's side door and asked Meadow's minor daughter to exit the vehicle.

At approximately the same time, APD Detective Sonia Escobedo, Detective Beddow, and Sergeant Flanders approached the passenger side of the SUV. Detective Escobedo and Detective Beddow asked Defendant to exit

---

[5] The evidence at the hearing did not explain how Meadows' daughter came to be riding in the SUV.

the vehicle. Defendant replied that he had a cup in his lap and Officer Escobedo, who was on the driver's side, reached across the seat, unfastened Defendant's seatbelt, and removed a green cup with a lid from Defendant's lap. Officer Escobedo placed that cup in a cupholder in the center console, next to a red cup with a lid and a straw that was already in another cupholder.

Defendant then exited the SUV. Detective Beddow testified that as he was assisting Defendant out of the SUV, he could smell the odor of alcohol, although he could not tell whether the odor was emanating from Defendant or the vehicle. Defendant was handcuffed and informed that there was an active warrant for his arrest. Sergeant Flanders initially told Defendant that the warrant was for selling drugs out of Greensboro, but then indicated the warrant was from "Chatham County, Georgia." In response, Defendant stated that the warrant was from Virginia, he had "taken care of the warrant already," had made bond, and had a court date.

Officer Escobedo radioed APD dispatch to ask that the warrant be confirmed with the sheriff's office in Virginia.

Officers moved Defendant away from the SUV and began to search his person. Meanwhile, Detective Escobedo, who had remained at the open passenger side door of the SUV, stated "we got PC…open container…mini bottles." Defendant, apparently in response to that statement, said, "all that is mine...that liquor bottle is mine, y'all just seen me pour it in the cup."

7

Detective Beddow leaned into the SUV and removed two small bottles of vodka, one of which was empty, from the front passenger side floorboard. He then pulled a black fanny pack out from underneath the seat where Defendant had been sitting and onto the passenger side floorboard. Detective Beddow testified that he immediately thought the fanny pack contained a gun due to the pack's weight, and that, when he moved the pack, he could see the imprint of the bottom of a magazine. Detective Beddow left the fanny pack, unopened, on the floorboard, stood up, and stated "there's an 82 in there" – which was a code indicating that he had located a firearm. Sergeant Flanders moved to the open driver's side door and leaned in, and Detective Beddow told Sergeant Flanders that he (Detective Beddow) could "see the butt of the handle…"[6]

Defendant was placed in the back of Officer Escobedo's patrol car and continued to insist that the warrant had been taken care of.

Detective DeStefano then returned to the SUV. He reached into the vehicle, removed the green cup, took off the lid, and smelled the contents. He immediately stated "smells like vodka to me," and walked over to the side of the on-ramp to empty the cup. Through the open window of Officer Escobedo's patrol car, Defendant stated "I just poured it in there...don't pour my s*** out, bro." Detective DeStefano returned the green cup to the center console, while

---

[6] Inside the fanny pack was a handgun with a fully automatic switch kit. The handgun was reported as stolen.

remarking on the "distinct odor of vodka." He then removed the red cup from the SUV and emptied its contents. Defendant again stated "don't pour my s*** out." Detective DeStefano responded to Defendant by stating that because Meadows would be allowed to drive the SUV away, the officers could not allow her to have an open container in the car.

Approximately twenty minutes into the Traffic Stop, APD dispatch radioed Officer Escobedo and advised that the authorities in Virginia had confirmed that the warrant was still active.

III. Analysis

A. The Arrest

Defendant argues that there was no probable cause to arrest him because the officers improperly relied on inaccurate information in the NCIC database.

Defendant's June 22, 2023 arrest on the Virginia Charges is troubling. There appears to be no dispute that, some three months earlier (on March 29, 2023), Defendant had been arrested on the same charges by an officer with another police department in Buncombe County, was taken to the Buncombe County Detention Facility, and then released on bond. This information is consistent with Defendant's repeated (and relatively detailed) statements to the officers during the Traffic Stop on June 22 that he had already been arrested on the warrant and had made bond. The Government has failed to

9

explain why the warrant remained active in the NCIC database following Defendant's arrest on March 29.

The question presented, though, is whether the officers' reliance on the information in the NCIC database was appropriate.

On that point, some testimony during the hearing indicated that the NCIC database is not infallible. For example, Detective Beddow testified that he had seen inaccurate information in the NCIC database regarding stolen property and AMBER alerts.

However, other information was provided about the accuracy of the NCIC database. For example, Officer Escobedo testified that he had used the NCIC database consistently to locate wanted individuals, and that he had found active warrants for individuals using the database "well over 50 times." He also testified that in only one instance was an active warrant not confirmed by the issuing agency.

Further, with regard to the specific facts presented here, prior to the Traffic Stop, Officer Escobedo identified Defendant as being the same individual that he had observed following the earlier traffic stop of the Altima and, during the Traffic Stop, Officer Escobedo called dispatch to confirm the warrant and was told by dispatch that the issuing agency had confirmed that the warrant remained active.

10

Accordingly, while Defendant's statements regarding the arrest warrant were ultimately determined to be true, the undersigned is persuaded that law enforcement reasonably relied on the information in the NCIC database and the subsequent confirmation by the agency that issued the arrest warrant for Defendant. See United States v. McDowell, 745 F.3d 115, 121-122 (4th Cir. 2014) ("In view of this widespread use of NCIC reports, we cannot agree with McDowell's blanket assertion that NCIC reports are categorically unreliable."); U.S. v. Brown, 618 Fed. Appx. 743, 745 (4th Cir. 2015) (finding officer reasonably relied on information contained in NCIC database when arresting defendant on an arrest warrant shown as active in the NCIC database because "this court has concluded that the NCIC database generally is accurate and that widespread use of its reports indicates they may be trusted" and officer took the additional step of asking his dispatcher to confirm that the warrant was active); United States v. Green, No. 1:17cr9-MR-DLH, 2017 WL 6757647, at *12 (W.D.N.C. Dec. 1, 2017) ("The timing of the confirmation call does not affect the outcome in this case because dismissal of the bills of indictment was not discovered until 7:23 p.m. when Defendant arrived at the Buncombe County Jail. This was more than three hours after Defendant was arrested. (Gov.'s Exs. 1, 2, 3.) Whether the call for confirmation was made before or after Defendants' arrest, it would have shown that the arrest warrants were in

11

existence."), recommendation adopted, 2017 WL 6734225 (W.D.N.C. Dec. 29, 2017).

### B. The Search of the SUV

Defendant next contends that the search of the fanny pack was improper because the small liquor bottles seen in the front passenger floorboard area did not provide probable cause to search the SUV.[7]

"As a general rule, the Fourth Amendment requires that law enforcement searches be accompanied by a warrant based on probable cause." United States v. Kolsuz, 890 F.3d 133, 137 (4th Cir. 2018). However, pursuant to the automobile exception, "officers may search a vehicle without a warrant if the vehicle 'is readily mobile and probable cause exists to believe it contains contraband or evidence of criminal activity.'" United States v. Graham, 686 Fed. App'x 166, 173 (4th Cir. 2017) (quoting United States v. Baker, 719 F.3d

---

[7] The Government makes an initial argument that Defendant lacks standing to object to the search of the fanny pack, and in its supplemental briefing, asserts that the firearm was located in "plain view." However, the "plain view" argument was not developed during the suppression hearing. With respect to standing, Defendant had a sufficient possessory interest in the fanny pack to challenge its search. Defendant asserted in his affidavit that he was holding onto the fanny pack for Meadows' son and the testimony during the suppression hearing indicated that officers surveilling the Econo Lodge reported that Defendant exited the SUV while wearing a black fanny pack, entered one of the three rooms under surveillance for a brief period, and returned to the passenger seat of the SUV while still wearing the fanny pack. Doc. 18-10. See e.g., United States v. Barber, 777 F.3d 1303 (11th Cir. 2015) (passenger had standing to challenge the search of his bag, which "was at his feet when the officers stopped the car," "even if he lacked standing to contest the search of the car").

12

313, 319 (4th Cir. 2013)).[8] "Probable cause requires only 'a fair probability,' and not a prima facie showing, that 'contraband or evidence of a crime will be found in a particular place.' Probable cause is therefore 'not a high bar.'" United States v. Bosyk, 933 F.3d 319, 325 (4th Cir. 2019) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983); District of Columbia v. Wesby, 583 U.S. 48, 57 (2018)) (internal citations omitted).

North Carolina law prohibits any person from driving a motor vehicle on a highway "[w]hile there is an alcoholic beverage in the passenger area in other than the unopened manufacturer's original container" and while "consuming alcohol or while alcohol remains in the driver's body." N.C.G.S. § 20-138.7(a). The statute also prohibits, subject to certain exceptions not applicable here, any person from possessing "an alcoholic beverage other than in the unopened manufacturer's original container" or consuming "an alcoholic beverage, in the passenger area of a motor vehicle…" N.C.G.S. § 20-138.7(a1).

Here, officers observed two small liquor bottles in the front passenger area of the SUV, one that appeared to be sealed and one that was empty. They also saw a red reusable plastic cup with a lid and a straw in the center console. A green reusable plastic cup with a lid (but no straw) was initially located in Defendant's lap. Detective Beddow testified that as he was assisting Defendant

---

[8] The Government does not rely on the "search incident to arrest" exception to the warrant requirement.

out of the SUV, he could smell the odor of alcohol, although he could not tell whether the odor was coming from Defendant or the vehicle.

Finally, Defendant claimed ownership of the suspected alcohol when Detective Escobedo observed the small bottles and stated that they provided probable cause to search the SUV (and Defendant again claimed ownership of the alcohol when the contents of the two cups were being emptied).

The undersigned is persuaded that the totality of these circumstances made it reasonable for the officers to believe a violation of N.C.G.S. § 20-138.7 may have occurred.

Defendant argues, though, that assuming he had committed an open container violation, that violation would be an infraction, and therefore a "noncriminal violation of law" that would not provide probable cause to believe the SUV contained contraband or evidence of *criminal* activity. Doc. 28 at 5, n. 3; see also N.C.G.S. § 20-138.7(e); N.C.G.S. § 14-3.1 (defining an infraction as a "noncriminal violation of law not punishable by imprisonment").

However, Defendant does not provide any authority specifically holding that an open container violation by a passenger or other infraction under North Carolina law cannot support probable cause to search a vehicle. See Doc. 27 at 5, n. 3.

Additionally, one North Carolina court has reasoned that the noncriminal infraction of driving left of center still retains criminal

characteristics. See State v. Hamrick, 110 N.C.App. 60, 66 (1993) ("Although a violation of N.C.Gen.Stat. § 20-146…is considered an infraction, the infraction is nonetheless, for all practical purposes, of a criminal nature: a criminal summons is issued for a violation of the statute, the violator may be required to appear in criminal court, a punishment is involved, and the infraction may be used as the basis in a criminal prosecution"); cf. In re Randy C., No. A167331, 2024 WL 1950753, at *2 (Cal. Ct. App. May 3, 2024) ("[W]here probable cause to search a vehicle under the automobile exception exists, a law enforcement officer may search the vehicle irrespective of whether [the offense] is an infraction and not an arrestable offense.") (internal quotations and citations omitted)

Further, the holdings of other courts, though not binding, cut against Defendant's argument. See e.g., Bowling v. State, 227 Md. App. 460, 472-473 (2016) (explaining that "although possession of less than ten grams of marijuana" was no longer a crime under Maryland state law, any amount of marijuana was still "contraband" such that a search of a vehicle pursuant to the automobile exception was proper) (citing State v. Brown, 301 Or. 268 (1986) ("both the legal and common definitions of 'contraband' indicate that the term encompasses anything that the law prohibits possessing") (citing Black's Law Dictionary (9th ed. 2009); Webster's Third New Int'l Dictionary 494 (unabridged ed. 2002)).

15

The undersigned is therefore persuaded that the search of the SUV, including the fanny pack discovered under the passenger seat, was proper. See United States v. Venable, No. 5:19-CR-386-1H, 2021 WL 359752, at *7 (E.D.N.C. Jan. 6, 2021) ("Agent Cates observed Venable in the passenger seat of a parked car drinking from an open beer in a location where alcohol consumption was prohibited by state law. Cates also saw an empty beer can in the car from his viewpoint outside of the car. That is enough evidence to cause a person of ordinary prudence to believe that an alcohol-related crime had occurred, and that evidence of that offense would be located in the car….") (internal citations omitted), report and recommendation adopted, 2021 WL 359200 (Feb. 2, 2021); see also United States v. Robinson, 94 F.3d 643 (4th Cir. 1996) (per curiam) (unpublished table decision) ("The plain view of the two open alcohol containers, in violation of the law, allowed the officers to search for other open containers because it was reasonable to believe that other contraband might be found within the vehicle."); United States v. Howton, 260 Fed. Appx 813, 817 (6th Cir. 2008) (unpubl.) (where trooper discovered that at least one passenger in the vehicle had violated Kansas' open container law, the troopers "had probable cause to search for any other similar contraband, i.e., any open containers of alcohol being transported in the vehicle in violation of state law.") (citing United States v. McGuire, 957 F.2d 310, 314 (7th Cir.1992)); United States v. Rayton, No. 5:21-CR-40004-HLT-1, 2021 WL 4806312, at *6

16

(D. Kan. Oct. 14, 2021) ("Other courts have held that a lawfully observed open container of alcohol provides probable cause to search a vehicle for additional open containers.").

IV. **Recommendation**

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress (Doc. 18) be **DENIED**.

Signed: June 25, 2024

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same.  **Responses to the objections must be filed within fourteen (14) days of service of the objections.**  Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985).